IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
———————————————————————  :
                         :
HENRY E. MCKINNON,       :        HON. JEROME B. SIMANDLE
                         :
          Plaintiff,     :        Civil No. 07-1694 (JBS/AMD)
                         :
     v.                  :
                         :             OPINION
                         :
ALBERTO R. GONZALES &    :
DEPARTMENT OF JUSTICE,   :
                         :
          Defendants.    :
                         :
———————————————————————  :
```

APPEARANCES:

James B. Dougherty, Jr., Esq.
LAW OFFICES OF JAMES B. DOUGHERTY, JR.
Post Office Box 267
205 Tuckerton Road
Suite 203
Medford, NJ 08055
     Attorney for Plaintiff

RALPH J. MARRA, JR.
Acting United States Attorney
By:  Paul A. Blaine,
     Assistant United States Attorney
401 Market Street, 4th Floor
Camden, New Jersey  08101
     Attorney for Defendants

**SIMANDLE**, District Judge:

## I.    INTRODUCTION

Plaintiff Henry E. McKinnon, an employee of the Federal Bureau of Prisons ("BOP"), filed this action against the United States Department of Justice and then-Attorney General Alberto R. Gonzales, alleging that Defendants discriminated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, et seq. ("Title VII").  Specifically, Plaintiff complains that he was discriminated against on account of his sex

(male), subjected to a hostile work environment, and retaliated against for having engaged in activity protected by Title VII.[1] Defendants have moved for summary judgment [Docket Item 21], arguing that Plaintiff has failed to adduce evidence sufficient to raise a material factual dispute as to any of these claims. For the reasons set forth below, the Court will grant in part and deny in part Defendants' motion.

## II.  BACKGROUND

### A.  Facts[2]

#### 1.  Unit Manager Position

Plaintiff Henry E. McKinnon, a forty-six-year-old African-American man, is an employee of the BOP who, at all times relevant to this lawsuit, has worked as a Unit Manager at the Federal Correctional Institution in Fort Dix, New Jersey ("FCI

---

[1]  Plaintiff's wife, Tami McKinnon, originally asserted a claim for loss of consortium.  As the Court reviews, infra, this claim was dismissed and Mrs. McKinnon was terminated as a party to this action.

[2]  The Court has endeavored to set forth the facts underlying this dispute in clear, chronological order.  Its capacity to do so was not facilitated by the parties' L. Civ. R. 56.1 statements, which, over the course of hundreds of paragraphs, leap from topic to topic without regard for the chronology of the underlying events.  See Petinga v. Sears, Roebuck and Co., No. 05-5166, 2009 WL 1622807, at *1 n.1 (D.N.J. June 9, 2009) (where the presentation of facts in 56.1 statements is disorganized and unclear, it "hamper[s] the process [of reviewing the record and materials submitted, and] any complaint that some piece of evidence was overlooked, for example in a motion for reconsideration, is correspondingly attenuated") (internal quotations and citations omitted).

2

Fort Dix"). (Compl. ¶¶ 2-4.) As a Unit Manager at FCI Fort Dix, Plaintiff was responsible for the administration of one of the institution's housing units, which included "responsibility for the program operations and security of the assigned unit," as well as supervision of the assigned unit's staff. (Blaine Cert. Ex. A at 3.)

        2.  <u>AW Nichols Becomes Plaintiff's Supervisor</u>

Between August 2004 and March 2006, Plaintiff's immediate supervisor was Jacqueline Nichols, who has served as an Associate Warden at FCI Fort Dix since March 2002. (Nichols Dep. at 5, 18.) Plaintiff and Associate Warden Nichols ("AW Nichols") enjoyed a "cordial" relationship when AW Nichols first arrived at FCI Fort Dix. (McKinnon Dep. at 221.) According to Plaintiff, before AW Nichols became his supervisor, he and AW Nichols would occasionally confide in each other; for instance, Plaintiff had filed an Equal Employment Opportunity ("EEO") complaint in 2001 asserting that he had been the victim of sex discrimination, and AW Nichols had "counseled McKinnon and suggested that he settle the case." (Pl.'s Statement of Material Facts ("SUMF") ¶ 19; McKinnon Dep. at 222.) Plaintiff settled his 2001 EEO complaint with the BOP in November 2003. (Compl. ¶¶ 8-9.)

The relationship between Plaintiff and AW Nichols began to deteriorate around the time that AW Nichols became Plaintiff's supervisor. The initial discord in Plaintiff's and AW Nichols'

relationship appears to trace back to June 2004, when the then-
Warden of the prison, Charles DeRosa, did not select AW Nichols
for an Executive Staff position.  (McKinnon Dep. at 22.)
According to Plaintiff, AW Nichols was angry over having been
passed over for the position, and she stated to Plaintiff,
apparently in reference to her prior advice that Plaintiff settle
his 2001 EEO complaint, "I told you [Warden DeRosa] wasn't going
to help you."  (Id. at 21.)  Plaintiff felt that AW Nichols'
comment was "derogatory" and he refused to join AW Nichols in
"bad mouth[ing]" Warden DeRosa.  (Blaine Cert. Ex. D-1 ¶ 4;
McKinnon Dep. at 21-22.)  Instead, Plaintiff informed Warden
DeRosa of what AW Nichols had said about him, which, according to
Plaintiff, made AW Nichols "extremely angry," and "set [her] off
on a path to ruin the reputation of Plaintiff."  (Blaine Cert.
Ex. D-1 ¶ 4.)

Shortly after AW Nichols became Plaintiff's supervisor in
August 2004, the two began to have disagreements over AW Nichols'
management style.  In October 2004, AW Nichols berated one of
Plaintiff's staff, Mr. Sanchez, for the manner in which Mr.
Sanchez and Plaintiff had handled an incident report that had
been generated for a disciplinary code violation committed by an
inmate in Plaintiff's unit.  (McKinnon Dep. at 25.)  Plaintiff
felt that AW Nichols "undermined [his] authority" by speaking
directly with Mr. Sanchez about the matter rather than speaking

to Plaintiff himself and believed that it was not appropriate for AW Nichols to have "gone out of channel." (Id.)

Also in October 2004, a probationary employee holding a secretarial position in Plaintiff's unit at FCI Fort Dix, Daisy Rodriguez, was terminated for having left work fifteen minutes early without requesting Plaintiff's permission. (Id. at 6.) Plaintiff believed that because he raised and investigated the issue of Ms. Rodriguez's early departure from work, (Nichols Dep. at 30), he would be targeted by institutional staff who disagreed with the decision to terminate Ms. Rodriguez, and on October 15, 2004, Plaintiff wrote a memorandum to AW Nichols "to ensure supporting documentation is [in] place in my personal file prior to any potential staff misconduct toward me." (Pl.'s Opp'n Br. Ex. H at 1.) The memorandum stated in relevant part:

> [S]everal institutional staff members made inquiries in regard to Daisy Rodriguez['s] termination. Specifically, some asked why was she terminated. My response to all was, "No comment." It should be noted, several of my long time colleagues advised me to, "Watch My Back" and Watch out for the, "Set-UP" . . . .
>
> It is very unfortunate one have to take these types of precautionary steps in order to do their job. It is my sincere hope I will be able to continue to carry out my responsibilities here at FCI Fort Dix without the fear of reprisal, retribution or retaliation from the Union or any one else for that matter . . . .

(Id.)[3]

---

[3] Ms. Rodriguez filed an EEO complaint concerning the events surrounding her termination, although the outcome of her complaint is not evident from the record. (McKinnon Dep. at 9.)

After Ms. Rodriguez was terminated, the unit that Plaintiff supervised, Unit Six, as well as a different unit, Unit One, each had only one secretary; normally, residential units at FCI Fort Dix have two secretaries.  (McKinnon Dep. at 15-16.)  In early 2005, interviews were conducted for secretarial staff, and one secretary, Tana Janokowski, was hired.  (Id. at 14, 16.) Plaintiff believed that Ms. Janokowski should have filled the vacancy in his unit, but AW Nichols instead determined that Ms. Janokowski would fill the vacancy in Unit One, (id. at 14); the Unit Manager for Unit One at the time, Allia Lewis, was a woman, (id.), and Plaintiff believes that AW Nichols gave preferential treatment regarding Ms. Janokowski's assignment to Ms. Lewis based upon Ms. Lewis' gender.  Warden John Nash[4] later told Plaintiff that the decision to assign Ms. Janokowski to Unit One was based upon "cost initiatives."  (Id.)

Plaintiff alleges that at approximately the same time, AW Nichols left vacant the position of Residential Drug Abuse Program ("RDAP") counselor in his unit.[5]  (Id. at 17.)  According to Plaintiff, AW Nichols failed to fill the position because she "didn't understand the importance of having that position filled

_____

[4]  John Nash served as the Warden of FCI Fort Dix between June 2004 and December 2005.  (Nash Dep. at 9.)

[5]  The RDAP counselor position was unique to Unit Six, for which Plaintiff was the Unit Manager in 2004 and 2005, because Unit Six was the Residential Drug Abuse Program unit.  (McKinnon Dep. at 16.)

6

. . . [and] thought that an RDAP case manager was the same as a regular case manager." (<u>Id.</u> at 17-18.)

3.   <u>April 11, 2005 Communications</u>

The interpersonal dispute between Plaintiff and AW Nichols continued into the spring of 2005.[6]  On April 11, 2005, AW Nichols left a voicemail for Plaintiff in which she expressed "concerns about some unprojected leave that [Plaintiff] took" in March when his mother had passed away.[7]  (<u>Id.</u> at 23.)  Plaintiff felt that AW Nichols' voice message expressing concerns about the leave he had taken was "threatening," "harassing," (McKinnon Dep. at 23), and "insensitive," (<u>id.</u> at 226), and he called AW Nichols to address her voicemail.

Plaintiff was unable to reach AW Nichols, who was in a meeting when he called, and he instead spoke with her secretary, Tonya Wallace.  (Blaine Cert. Ex. G-1 at 1.)  The parties dispute

---

[6]   During this time, Plaintiff believed that AW Nichols was "preoccupied with [his] whereabouts," in that she would contact his secretary to find out where he was.  (McKinnon Dep. at 69.) Plaintiff believes that AW Nichols should have contacted him via radio or telephone rather than speaking with his secretary.  (<u>Id.</u> at 71.)

[7]   At the time when Plaintiff had taken the leave in question, AW Nichols had been out of the institution, and upon her return to FCI Fort Dix, she sought to follow up with Plaintiff about the leave on account of the fact that Plaintiff had informed the Acting Associate Warden that the leave had been pre-approved.  (Nichols Dep. at 55.)  According to her deposition testimony, AW Nichols "didn't mind leave being taken, but [she] had concern with him telling somebody that [she] had preapproved the leave when [she] didn't."  (<u>Id.</u> at 55.)

the contents of Plaintiff's conversation with Ms. Wallace.
According to Defendants, Plaintiff informed Ms. Wallace that he
had attempted to reach AW Nichols two or three times and stated
that "she needs to call me right away.  I am not the one.  I'm
not the one (person) to play with."  (Id. at 1.)  According to
Defendants, Plaintiff then stated to Ms. Wallace that he would
"string her [AW Nichols] up," (id.), or "string [AW Nichols] up
the flag pole."  (Blaine Cert. Ex. G at 2.)  Ms. Wallace recalled
that Plaintiff was "angry and frustrated" and "loud as if to
vent."  (Blaine Cert. Ex. G-3 at 2.)  According to Plaintiff,
while he "felt that Ms. Nichols was playing games with [him]," he
did not threaten AW Nichols or make any remarks about stringing
her up the flagpole.  (Blaine Cert. Ex. G-4 at 2.)  Plaintiff
does not dispute that he stated to Ms. Wallace that he "was not
the one to play with."  (Id.)

Ms. Wallace spoke with Associate Warden David Huerta ("AW
Huerta") about Plaintiff's call, and when AW Nichols returned
from her meeting, Ms. Wallace informed her of the call.  (Blaine
Cert. Ex. G at 2.)  AW Nichols and AW Huerta then called
Plaintiff together on the speaker phone.  (Id.)  According to
Defendants, during this telephone call, Plaintiff admitted to
having stated that he would string AW Nichols up, (id.; Blaine
Cert Ex. G-3 at 2); Plaintiff maintains that he did not make any
such admission to AW Nichols and AW Huerta.  (Blaine Cert. Ex. G-

8

4 at 2.)

> 4.   <u>Plaintiff's EEO Complaint and the SIS
>      Investigation</u>

While it is clear that an investigation into Plaintiff's April 11, 2005 statements was subsequently initiated, the timing of the investigation, as well as the relationship between the investigation and other events that transpired during the summer of 2005, are the subject of dispute between the parties.  It is undisputed that Plaintiff met with Warden Nash on three occasions in May 2005 to complain that he felt that he was being harassed by AW Nichols.  (Nash Dep. at 27.)  AW Nash did not consider separating Plaintiff and AW Nichols because he "felt she was treating him the same as she treated everybody else" and because he did not believe Nichols was harassing Plaintiff.  (<u>Id.</u> at 32.) Plaintiff asserts that at some point during the month of May 2005, he complained to Warden Nash about AW Nichols, and Warden Nash warned Plaintiff not to do anything that Plaintiff would regret.  (McKinnon Dep. at 55.)  Warden Nash denies having made any such comment to Plaintiff.  (Nash Dep. at 37.)

It is undisputed that during this time, Plaintiff and AW Nichols repeatedly clashed over his time and attendance sheets and other administrative matters, with Plaintiff complaining that AW Nichols was "picking on him" or micro-managing him, and with AW Nichols asserting that she simply was being "meticulous" about

time and attendance matters.[8]   (Nichols Dep. at 35.)   On June 6,
2005, following an exchange of emails between Plaintiff and AW
Nichols concerning such scheduling matters, Plaintiff wrote to AW
Nichols asking her to "acknowledge this response as my official
filing of an EEO Complaint against you for Harassment,
Retaliation/Reprisal, Threats, Interfering With An On-going EEO
Investigation, etc."  (Blaine Cert. Ex. G-5 at 1.)  Plaintiff
filed his EEO complaint that day, complaining that he had been
harassed.  (Blaine Cert. Ex. B.)

        Plaintiff alleges that the investigation into his April 11,
2005 remark to Ms. Wallace did not commence until just three days
after he filed his EEO complaint, on June 9, 2005, when he and
the other witnesses to the events of April 11, 2005 were
interviewed by John Pittman, FCI Fort Dix's Special Investigative
Agent ("SIA Pittman"), (Blaine Cert. Ex. G-5 at 3); the timing,
Plaintiff maintains, is suggestive of the retaliatory nature of
the investigation.  Defendants assert that Plaintiff's April 11,
2005 telephone call "was referred for investigation shortly after
the incident occurred on April 11, 2005 . . .[,] well before
McKinnon's initial EEO contact on June 6, 2005," (Defs.' Reply
Br. at 11), although there appears to be no evidence in the

_____

        [8]   During one such conflict, Plaintiff asserts, AW Nichols
stated to Plaintiff, "[n]ow you know how Daisy Rodriguez feels";
AW Nichols denies having made this statement, and recalls instead
having said "I have held you accountable for your time just like
you held Daisy accountable for her time."  (Nichols Dep. at 32.)

record that establishes that the investigation was launched immediately after the April 11, 2005 telephone call.[9]  At the conclusion of the investigation, and following a hearing before Warden Nash at which Plaintiff was represented by counsel, Plaintiff was suspended for three days for having committed unprofessional conduct.  (Blaine Cert. Ex. G-7 at 1.)

     5.  <u>Unit Transfers</u>

On August 22, 2005, all unit managers for the six units at FCI Fort Dix were reassigned to different units from those which they had been managing.  (Blaine Cert. Ex. H at 1.)  Such unit reassignments occurred regularly at the institution "when management decides that the units are ready for a change." (McKinnon Dep. at 153.)  During his years as a unit manager at FCI Fort Dix, reassignments of the unit managers occurred eight times, and Plaintiff has managed each of the six units at one

_____

[9]  Warden Nash's deposition testimony on this point was as follows:

Q:    Was the filing of the EEO complaint, and then the institution of the SIS investigation pretty close in time, to the best of your knowledge?

A:    Wow, you know, without the documents in front of me, I cannot give you dates, times, places, things like that.  I don't recall specifics . . . . When the actual investigation was initiated, I do not recall.

(Nash Dep. at 47-48.)  Defendants have identified no documentary evidence that sheds any greater light on the timing of these events.

time or another.  (Id. at 152-53.)

Plaintiff was transferred from Unit Six to Unit Three, while
Allia Lewis, whom Plaintiff asserts received favorable treatment
from AW Nichols, was transferred to Unit Four.[10]  (McKinnon Dep.
at 156.)  According to Plaintiff, none of the unit managers
"wanted to go to Unit 3 . . . because that's the hostile unit."
(Id. at 161.)  Plaintiff concluded that the unit managers'
concerns over the state of Unit Three were well-founded, in that
he determined shortly after becoming Unit Manager that Unit Three
was "out of control."  (Pl.'s Opp'n Br. Ex. I at 1)
(capitalization omitted).  Two days after he was transferred to
Unit Three, Plaintiff wrote an email to AW Nichols with the
subject line "snapshot unit 3, (hostile working environment)."
(Id.) (capitalization omitted).  In his email, Plaintiff detailed
a list of problems: "staff not speaking to one another, one
diming out the other, one calling the other staff a rat, snitch,
inmate lover," as well as operational concerns, such as
"[i]ncident reports not being logged in and accounted for."  (Id.
at 1-2.)  Plaintiff also informed AW Nichols that inmates were

---

[10]  As another example of the favorable treatment Ms. Lewis
allegedly received, Plaintiff asserts that AW Nichols tapped Ms.
Lewis to serve as acting associate warden more often than she
tapped Plaintiff to serve in that position after he filed his EEO
complaint against her.  (McKinnon Dep. at 104.)  According to
Plaintiff, Ms. Lewis served as acting associate warden on more
than four occasions following the filing of his EEO complaint,
whereas Plaintiff only served twice in that capacity.  (Id.)

threatening staff members.[11]  (Nichols Dep. at 84.)

    AW Nichols responded to Plaintiff's email with a lengthy email, in which she commended Plaintiff for having "laid the groundwork to build your team," instructed Plaintiff to report "violations that are perceived to have occurred" in order for such matters to be investigated, and advised Plaintiff to hold his staff "accountable for the work they do or don't do."  (Id. at 1.)  Warden Nash, to whom Plaintiff's email was forwarded, wrote to AW Nichols, asking her to "call Mr. McKinnon in and explain to him his responsibility to stop this type of behavior." (Id. at 5.)  Plaintiff continued to correspond with Warden Nash and AW Nichols about problems with Unit Three, expressing his concern that someone in the unit could "get[] hurt either from inmates or from their fellow staff members."  (Pl.'s Opp'n Br. Ex. J at 1.)  Plaintiff believes that Warden Nash and AW Nichols failed to respond appropriately, and he wrote to the BOP's Office of Internal Affairs ("OIA") to complain of "gross negligence on the part of the Executive Staff," stating that "staff feel their lives are in jeopardy from inmates & unit staff are going at each other's throat."  (Pl.'s Opp'n Br. Ex. K at 1.)  The OIA's response to Plaintiff's complaint, if any, is not evident from

---

    [11]  There is no suggestion from the evidence in the record that the difficulties in Unit Three resulted from discrimination by any of the unit's staff on the basis of a protected characteristic.

the record.  At some point "[a]t the height of the hostility in Unit 3," Plaintiff submitted a written request to be transferred out of the unit, which was not granted.  (McKinnon Dep. at 60.)

In September 2006, Plaintiff attended a Special Housing Unit ("SHU") meeting in the office of Charles Samuels, who had become the warden of FCI Fort Dix at the beginning of 2006.  Plaintiff was the Unit Manager of one of the inmates being held in the SHU, and, as such, he was expected to provide Warden Samuels with information pertaining to the inmate.  (Defs.' SUMF ¶ 50; Pl.'s SUMF ¶ 50; Blaine Cert. Ex. K at 1.)  Warden Samuels became upset when Plaintiff was unable to provide such information at the meeting, and wrote an email to Plaintiff and Associate Warden Claude Maye ("AW Maye") stating that Plaintiff was "not authorized to attend the SHU meeting or [the] Department Head meeting until [Warden Samuels] receive[d] certification from [AW Maye] he knows his case load as the assigned Unit Manager." (Blaine Cert. Ex. K at 1.)  Plaintiff missed one SHU meeting and was not able conduct one round through the SHU as a result of this incident, and after Plaintiff met with AW Maye, Plaintiff was able to return to SHU meetings and rounds "ASAP."  (McKinnon Dep. at 109-12.)  Plaintiff believes Warden Samuels' response to his failure to prepare for the meeting was unnecessary and

14

related to his June 6, 2005 EEO complaint.[12]

In November 2006, Plaintiff was transferred to the Unit Manager position in Unit Four.[13]  (Id. at 50.)  In March 2007, four months after Plaintiff became the Unit Manager of Unit Four, Warden Samuels ordered that Unit Four, as well as two additional buildings on the west side of FCI Fort Dix, be temporarily closed as a result of the reduction of 1,200 inmates in the prison population.  (Blaine Cert. Exs. N, N-1, N-2, N-3; McKinnon Dep. at 182-85.)  According to Warden Samuels, "closing the west side would allow for better resource management, a reduction in overtime usage by correctional officers due to staffing shortages, and repair and renovation of certain west side buildings while they were unoccupied."  (Samuels Decl. ¶ 2.)  Plaintiff believed that Warden Samuels should have closed the east side of the institution rather than the west side, and felt that Warden Samuels closed the west side of the institution in order to "harass[] [and] retaliat[e]" against Plaintiff for having filed his June 2005 EEO complaint.  (McKinnon Dep. at

---

[12]  At an earlier meeting in 2006, Warden Samuels had "berat[ed]" Plaintiff, (McKinnon Dep. at 188), by informing Plaintiff that he was "skating on thin ice" and that he was either with the executive staff or against them.  (Id. at 44.)

[13]  As with Plaintiff's transfer to Unit Three, this transfer was the result of a unit reassignment during which four unit managers at the institution were reassigned.  (McKinnon Dep. at 61.)  Ms. Lewis was also reassigned at the time of this transfer.  (Id.)

188.)

Unit Four was closed down by May 9, 2007; Plaintiff remained the Unit Manager of Unit Four until it closed, and on May 2, 2007, he became Unit Manager of Unit Two, which remained open. (Id. at 193-94.)  Plaintiff has since served as Unit Manager for Unit Two, where his responsibilities are no different than they were when he managed Unit Four.  (Id. at 194, 197.)

### B.   Procedural History

Plaintiff first contacted an EEO counselor regarding his complaint of discrimination by AW Nichols on June 6, 2005, and on July 5, 2005, Plaintiff filed an administrative complaint with the BOP, complaining of sex discrimination and retaliation. (Blaine Cert. Ex. B at 1.)  Plaintiff amended his EEO complaint in September 2005 to assert that he had been transferred to a hostile working environment (Unit Three), (Blaine Cert. Ex. B-1 at 1), and amended it again in November 2005 after he was disciplined for his April 11, 2005 telephone conversation with Tonya Wallace.  (Blaine Cert. Ex. B-2 at 1.)

Plaintiff filed the civil Complaint in this action on April 9, 2007 [Docket Item 1].  He alleges that he was retaliated against for engaging in Title VII-protected activity (Count I), that he was discriminated against on account of his sex (Count II), and that he was exposed to a hostile work environment (Count III).  Plaintiff's wife, Tami McKinnon, also asserted a claim for

16

loss of consortium (Count IV).  Upon Defendants' motion, the
Court dismissed Mrs. McKinnon's claim and terminated Mrs.
McKinnon as a party to this action [Docket Items 10 and 11].[14]
Following a period of discovery, Defendants filed the motion for
summary judgment presently under consideration [Docket Item 21],
to the merits of which the Court now turns.

## III.  DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate when the materials of record
"show that there is no genuine issue as to any material fact and
that the moving party is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(c).  In deciding whether there is a
disputed issue of material fact, the court must view the evidence
in favor of the non-moving party by extending any reasonable
favorable inference to that party; in other words, "the nonmoving
party's evidence 'is to be believed, and all justifiable
inferences are to be drawn in [that party's] favor.'"  Hunt v.
Cromartie, 526 U.S. 541, 552 (1999) (quoting Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 255 (1986)).  The threshold inquiry is
whether there are "any genuine factual issues that properly can

---

[14]   The Court explained, in dismissing Mrs. McKinnon's
claim, that "[a] claimant's right to recover under an
employment discrimination statute does not support a loss of
consortium claim by the claimant's spouse."  (Docket Item 10 at
4) (quoting Acevedo v. Monsignor Donovan High School, 420 F.
Supp. 2d 337, 342 (D.N.J. 2006), and citing numerous cases so
holding).

be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

Although entitled to the benefit of all justifiable inferences from the evidence, "the nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific facts showing that there is a genuine issue for trial,' else summary judgment, 'if appropriate,' will be entered."  United States v. Premises Known as 717 South Woodward Street, Allentown, Pa., 2 F.3d 529, 533 (3d Cir. 1993) (quoting Fed. R. Civ. P. 56(e)) (citations omitted).

### B.   Hostile Work Environment Claim

The Court first addresses Defendants' motion for summary judgment as to Plaintiff's hostile work environment claim in Count III.  In their motion, Defendants argue that Plaintiff has failed to adduce sufficient evidence to suggest that he was subjected to a hostile work environment in violation of Title VII.  For the reasons that follow, the Court agrees, and will grant Defendants' motion for summary judgment as to Plaintiff's hostile work environment claim.

Title VII of the Civil Rights Act of 1964 makes it unlawful

18

for an employer to "discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's . . . sex[.]"  42 U.S.C. § 2000e-2(a)(1).  "It is well established that a plaintiff can demonstrate a violation of Title VII by proving that . . . harassment [based upon a Title VII-protected characteristic] created a hostile or abusive work environment."  Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293 (3d Cir. 1999).  To prevail upon a hostile work environment claim against an employer, a plaintiff must establish:

> (1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100, 104 (3d Cir. 2009) (citation omitted).

As the first four of these elements make clear, the sine qua non of a hostile work environment claim is a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]"  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (internal citations and quotations omitted, emphasis added); see also Moore v. City of Philadelphia, 461 F.3d

331, 342 (3d Cir. 2006) ("Many may suffer . . . harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief"); Murphy v. Board of Educ. of Rochester City School Dist., 273 F. Supp. 2d 292, 311 (W.D.N.Y. 2003) ("The key, of course, is that the acts must relate to some discriminatory activity").  An unpleasant workplace does not constitute a hostile work environment within the meaning of Title VII if the difficult conditions result from something other than discrimination based upon a characteristic or activity protected by Title VII.  See Trujillo v. University of Colorado Health Sciences Center, 157 F.3d 1211, 1214 (10th Cir. 1998) ("federal law does not guarantee a utopian workplace, or even a pleasant one") (internal quotations and citations omitted).  That is, "in order to establish such a claim, the plaintiff must show not only that his work environment was intolerable, but also that it was discriminatory." Murphy, 273 F. Supp. 2d at 312.  The critical inquiry with regard to the hostile work environment claim in this case is therefore whether Plaintiff was subjected to pervasively abusive conditions to which women or those who did not engage in EEO-protected activity were not exposed.  See Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006), overruling on other grounds recognized by Moore, 461 F.3d at 340.

It is clear that Plaintiff has not put forth sufficient

evidence to sustain his hostile work environment claim based on gender discrimination or retaliation.  The primary focus of Plaintiff's hostile work environment claim is his contention that the entirety of Unit Three, for which he served as Unit Manager between August 2005 and November 2006, was a hostile and abusive environment.  As Plaintiff argues, "[t]he unit was replete with threats between staff, threats between staff and inmates and a bounty being placed on the head of one of the employees [by an inmate]," (Pl.'s Opp'n Br. at 30), and because these factors made Unit Three such an unpleasant and potentially dangerous place to work, Plaintiff believes that the unit amounted to a hostile work environment.

     Plaintiff's argument misconstrues the basic premise of a hostile work environment claim.  While Plaintiff's evidence certainly suggests that Unit Three was, like most correctional facilities, a challenging and at times unpleasant place to work, it is well-settled that "[d]ifficult or stressful working conditions are not tantamount to a 'hostile' work environment caused by acts of discrimination."  Murphy, 273 F. Supp. 2d at 312; see also, e.g., Hartsell v. Duplex Products, Inc., 123 F.3d 766, 773 (4th Cir. 1997) ("Title VII does not guarantee a happy workplace, only one free from unlawful discrimination").  Plaintiff has identified no evidence suggesting that he and the other employees of Unit Three were exposed to the challenging

work conditions he identifies on account of being male or on account of having engaged in Title VII-protected conduct. Indeed, to the extent the evidence reveals anything, it suggests that precisely the opposite is true: both male and female employees in Unit Three were exposed to the challenging conditions in that unit, (Pl.'s Opp'n Br. Ex. L at 1), and the composition of Unit Three staff was not restricted to employees who had filed EEO complaints.  (Id.; Nash Dep. Ex. P-1 at 1-2); see Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998) ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed") (citation omitted).[15]  Unit Three may have been a difficult and stressful working environment, but Plaintiff's own evidence makes plain that such difficulty was experienced by women as well as men, (Pl.'s Opp'n Br. Ex. J at 1; Ex. L at 1), and there is no suggestion from the evidence that the adversity in Unit Three was visited exclusively upon employees who had engaged in Title VII-protected activity.  See Jensen, 435 F.3d at 449.  The evidence shows instead that Unit Three was a challenging workplace because of infighting among staff and

---

[15]  See also Connell v. Nicholson, 318 Fed. Appx. 75, 77 (3d Cir. 2009) (where "both male and female . . . employees were exposed" to a challenging working condition, the condition lends no support to hostile work environment claim based upon sex discrimination).

tension between staff and inmates, (Pl.'s Opp'n Br. Ex. I at 1; Nichols Dep. at 84), not because it was a "workplace . . . permeated with <u>discriminatory</u> intimidation, ridicule, and insult." <u>National R.R. Passenger Corp.</u>, 536 U.S. at 116 (emphasis added).

The remainder of Plaintiff's evidence likewise fails to support his hostile work environment claim.  Plaintiff complains that AW Nichols' close supervision of him, her efforts to contact him through his secretary rather than via radio, and her alleged micro-management of his time and attendance matters amounted to harassment, but it is well-settled that "being closely supervised or 'watched' does not constitute an adverse employment action that can support a claim under Title VII," <u>Lester v. Natsios</u>, 290 F. Supp. 2d 11, 30 (D.D.C. 2003), and that "having one's work micromanaged may be unpleasant but does not . . . [give rise to] a hostile environment claim." <u>Haley v. Alliance Compressor LLC</u>, 391 F.3d 644, 652 (5th Cir. 2004) (citation omitted); <u>see</u> <u>also</u> <u>Rizvi v. JP Morgan Chase</u>, --- F. Supp. 2d ----, 2009 WL 1395533, at *6 (N.D. Ill. May 19, 2009) (same); <u>Scafidi v. Baldwin Union Free School Dist.</u>, 295 F. Supp. 2d 235, 239 (E.D.N.Y. 2003). Although Plaintiff may have disagreed with AW Nichols' management style, being closely supervised or micro-managed does not give rise to a hostile work environment claim.  <u>Id.</u>

Nor does the brief collection of unfriendly comments uttered

to Plaintiff over the course of the time at issue in this lawsuit
begin to approximate the level of pervasive, discriminatory
hostility necessary to ground a hostile work environment claim.
First, in light of the fact that even "'the sporadic use of
abusive language, gender-related jokes, and occasional teasing'
do not support a hostile work environment claim," <u>Perry v.
Harvey</u>, No. 08-3339, 2009 WL 1566791, at *2 (3d Cir. June 5,
2009) (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788
(1998)), it bears emphasis that Plaintiff failed to identify a
single gender-based comment, joke, or insult that would suggest
that he was subjected to "pervasive and regular" discrimination
on account of his sex.  <u>Huston</u>, 568 F.3d at 104.  And while the
few remarks that Plaintiff endeavors to characterize as
retaliatory harassment[16] may be relevant to his retaliation
claim, discussed <u>infra</u>, these stray remarks manifestly were not
so "extreme [as] to amount to a change in the terms and
conditions of [his] employment." <u>Caver v. City of Trenton</u>, 420
F.3d 243, 262 (3d Cir. 2005) (citation omitted); <u>see</u>, <u>e.g.</u>, <u>Clair
v. Agusta Aerospace Corp.</u>, 592 F. Supp. 2d 812, 822-23 (E.D. Pa.
2009) (citing multiple cases for the proposition that five

---

[16] The remarks in question include Warden Nash's advice
that Plaintiff not do anything that he would regret, (McKinnon
Dep. at 55), and Warden Samuels' statement that Plaintiff
was "skating on thin ice" and that he was either with the executive
staff or against them.  (<u>Id.</u> at 44.)  By no stretch can these
remarks be characterized as gender-based.

remarks over the course of a twenty-one month employment period does not constitute pervasive discrimination for purposes of a hostile work environment claim); Subh v. Wal-Mart Stores East, LP, No. 07-479, 2009 WL 866798, at *17 (D. Del. Mar. 31, 2009) (same).

In short, the Court concludes that Plaintiff has failed to adduce evidence sufficient to suggest that his "workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." National R.R. Passenger Corp., 536 U.S. at 116 (internal quotations and citations omitted). The Court will thus grant Defendants' motion for summary judgment as to Plaintiff's hostile work environment claim, entering summary judgment for Defendants on Count III.

### C. Retaliation Claim

Defendants have moved for summary judgment as to the entirety of Plaintiff's Title VII retaliation claim in Count I. For the reasons that follow, the Court will grant in part and deny in part Defendants' motion for summary judgment on Plaintiff's retaliation claim.

### 1. McDonnell Douglas Framework

Plaintiff's retaliation claim is brought pursuant to Title VII's anti-retaliation provision, which states:

25

> It shall be an unlawful employment practice for an
> employer to discriminate against any of his employees .
> . . because he has opposed any practice made an unlawful
> employment practice by this subchapter, or because he has
> made a charge, testified, assisted, or participated in
> any manner in an investigation, proceeding, or hearing
> under this subchapter.

42 U.S.C. § 2000e-3(a).  When addressing a motion for summary

judgment on a retaliation claim brought pursuant to Title VII,

the Court employs the familiar burden-shifting framework set

forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),

and its progeny.  See Moore v. City of Philadelphia, 461 F.3d

331, 342 (3d Cir. 2006) (applying McDonnell Douglas framework in

retaliation case).  Under the first step of the McDonnell Douglas

analysis, the Court looks to whether Plaintiff has stated a prima

facie case for retaliation, which entails proof of three

elements: "(1) [Plaintiff] engaged in activity protected by Title

VII; (2) the employer took an adverse employment action against

[him]; and (3) there was a causal connection between [his]

participation in the protected activity and the adverse

employment action."  Id. at 340-41 (citation omitted).  Where, as

here, a plaintiff has "cast [his] net wide" in identifying a

range of allegedly retaliatory conduct, the Court must determine

at the prima facie stage with aspects of the claim may be

actionable and which are not.  Id. at 349 (explaining that "[t]he

prima facie case serves to identify what harassment, if any, a

reasonable jury could link to a retaliatory animus") (internal

quotations and citations omitted).

The establishment of a prima facie case gives rise to a presumption that the employer unlawfully retaliated against the plaintiff. Id. at 342.

> Once the plaintiff establishes . . . [his] prima facie case, the burden shifts to the defendant to articulate one or more legitimate, non-discriminatory reasons for its employment decision. If one or more such reasons are proffered, the presumption of discrimination created by establishment of the prima facie case is dispelled, and the plaintiff must prove that the employer's proffered reason or reasons were pretextual – that is, that they are false and that the real reason for the employment decision was discriminatory.

Waldron v. SL Industries, Inc., 56 F.3d 491, 494 (3d Cir. 1995).

As the preceding discussion indicates, "[u]nder the McDonnell Douglas approach, the burden of persuasion remains on the plaintiff, but the burden of going forward shifts." Johnson v. Penske Truck Leasing Co., 949 F. Supp. 1153, 1170 (D.N.J. 1996). At the third stage of the analysis, if the employer has erased the presumption of discrimination by putting forth a non-discriminatory explanation for its action, the plaintiff "may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Waldron, 56 F.3d at 495 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). To survive a summary judgment motion, "the

plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action." Fuentes, 32 F.3d at 764 (internal quotations and citations omitted). In other words, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Id. at 765 (internal quotations, citations, and emphasis omitted).

     2.  Prima Facie Case

        a.  Title VII-Protected Activity

With regard to the first element of Plaintiff's prima facie case, the Court of Appeals has explained that "the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." Moore, 461 F.3d at 341. The Court concludes that Plaintiff engaged in Title VII-protected activity by filing his initial EEO complaint in 2001 and by filing his second EEO complaint in 2005, each of which constitutes "ma[king] a charge" within the meaning of 42 U.S.C. §

2000e-3(a).   To the extent that Plaintiff can prove that
Defendants took retaliatory adverse action that can be causally
linked to either of these complaints, such retaliation would be
actionable under Title VII.[17]   See Moore, 461 F.3d at 341.

> b.   Materially Adverse Action

Regarding the second element of Plaintiff's prima facie
case, a materially adverse action, the Court of Appeals recently
explained the impact of Burlington Northern and Santa Fe Ry. Co.
v. White, 548 U.S. 53 (2006), upon retaliation claims as follows:

> [The Supreme Court explained that] "the anti-retaliation
> provision, unlike the substantive provision, is not
> limited to discriminatory actions that affect the terms
> and conditions of employment." [Burlington Northern, 126
> S. Ct.] at 2412-13.   Because the discrimination and
> retaliation provisions "are not coterminous," the Court
> concluded that "[t]he scope of the anti-retaliation
> provision extends beyond workplace-related or
> employment-related retaliatory acts and harm."   Id. at
> 2414.   Consistent with this view, the Court held that a
> plaintiff claiming retaliation under Title VII must show

---

[17]   In his deposition, (McKinnon Dep. at 10), and in his
brief, Plaintiff appears to rest his retaliation claim in part
upon the premise that he was retaliated against for having
launched the investigation that resulted in Daisy Rodriguez's
termination.   A supervisor's investigation into employee
misconduct which results in the employee's termination is not
"participat[ing] in any manner in an investigation, proceeding,
or hearing under Title VII," Robinson v. Southeastern
Pennsylvania Transp. Authority, 982 F.2d 892, 896 n.4 (3d Cir.
1993) (brackets and citation omitted, emphasis added), and cannot
form the basis of a retaliation claim.   To the extent that
Plaintiff believes he was retaliated against for having
investigated Ms. Rodriguez's alleged misconduct, (Compl. ¶
51(b)), such retaliation is not cognizable under Title VII.   The
only cognizable Title VII-protected activity in this case
consists of his filing of his own EEO complaints in 2001 and
2005.

that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Id.</u> at 2415.

<u>Moore</u>, 461 F3d at 341.

The standard a plaintiff must meet in establishing a materially adverse action is widely recognized to be "lower for a retaliation claim than for a disparate treatment claim." <u>Flynn v. New York State Div. of Parole</u>, --- F. Supp. 2d ----, 2009 WL 1204349, at *19 (S.D.N.Y. Mar. 6, 2009).  That is, a plaintiff need not establish that the action adversely affected the terms and conditions of his employment under the retaliation provision, but must instead only show that the employer's actions could dissuade a reasonable employee from engaging in Title VII-protected conduct.  <u>See</u> <u>Burlington Northern</u>, 548 U.S. at 70-71.

Nevertheless, "[i]n evaluating whether actions are materially adverse, [the Court] must remain mindful that 'it is important to separate significant from trivial harms' because '[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.'" <u>Moore</u>, 461 F.3d at 346 (quoting <u>Burlington Northern</u>, 548 U.S. at 68).  Thus, while complaints of "micromanaging," <u>Ahern v. Shinseki</u>, No. 05-117, 2009 WL 1615402, at *5 (D.R.I. June 09, 2009), "[i]ncreased scrutiny" and

30

"reprimands about plaintiff's lateness," Flynn, --- F. Supp. 2d
----, 2009 WL 1204349, at *22 (citations omitted), would not,
under most circumstances, rise to the level of materially adverse
actions, courts have recognized that a reassignment of duties,
Burlington Northern, 548 U.S. at 70-71, or the imposition of
disproportionately heavy discipline, see Moore, 461 F.3d at 346,
would satisfy the Burlington Northern standard.

### i.  Actions Which Rise to the Level of Material Adversity

Applying this authority to the facts presented, the Court
finds that a limited number of the actions Plaintiff complains of
were "materially adverse," Burlington Northern, 548 U.S. at 68,
meaning that, to the extent that Plaintiff proves that the
actions were causally linked to his protected conduct and to the
extent that Defendants' explanations for these actions may be
viewed as pretextual, see infra, they are actionable under Title
VII.[18]  First, in light of the Supreme Court's recognition that

---

[18]  As an initial matter, the Court agrees with Defendants
that numerous actions Plaintiff complains of fall "outside the
statutory time period" and are not actionable herein.  National
R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 105 (2002).  As the
Court of Appeals has explained:

> In general, before filing a Title VII suit, an aggrieved
> federal employee must meet informally with an EEOC
> counselor within forty-five days of the alleged
> discriminatory event.  29 C.F.R. § 1614.105(a)(1) . . .
> . If the employee files suit in the district court, only
> those claims that are "fairly within the scope of the
> prior EEOC complaint, or the investigation arising
> therefrom," are considered to have been exhausted.

"one good way to discourage an employee . . . from bringing

discrimination charges would be to insist that [he] spend more

time performing the more arduous duties and less time performing

those that are easier or more agreeable," id. at 70-71, the Court

concludes that a factfinder could reasonably construe Plaintiff's

transfer from Unit Six to the "out of control" Unit Three, (Pl.'s

Opp'n Br. Ex. I at 1) (capitalization omitted), as materially

adverse.[19]  Plaintiff's testimony concerning the undesirable

---

Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984).

Moss v. Potter, No. 07-2779, 2007 WL 2900551, at *2 (3d Cir. Oct. 3, 2007).  Plaintiff first contacted an EEO counselor on June 6, 2005, (Blaine Cert. Ex. B), meaning that actions occurring before April 22, 2005 were not timely raised and cannot form the basis of Plaintiff's retaliation claim.  See 29 C.F.R. § 1614.105(a)(1).

The Court thus agrees with Defendants that Plaintiff's allegations that he was denied secretarial and other support staff in January or February 2005, as well as his allegation concerning AW Nichols' April 11, 2005 voice mail, were not timely raised with the EEOC and are thus at most relevant "as background evidence in support of a timely claim."  National R.R. Passenger Corp., 536 U.S. at 113.  Plaintiff's conclusory position that because "McKinnon has alleged that he was subject to continuing violations of his rights . . . all matters affecting his employment as raised in his EEO complaint . . . were administratively exhausted and are properly before the court," (Pl.'s Opp'n Br. at 3), runs contrary to the holding of National R.R. Passenger Corp. and is unsustainable.

[19]  To reiterate the Court's conclusion, supra, this does not mean that Unit Three was, as Plaintiff argues, a hostile work environment under Title VII.  An employer who "insist[s] that [an employee] spend more time performing the more arduous duties," Burlington Northern, 548 U.S. at 70-71, does not necessarily subject an employee to a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]"

state of Unit Three compared to the other residential units, (McKinnon Dep. at 161), suggests that his transfer, if it were causally linked to Plaintiff's EEO activity, see infra, would constitute a materially adverse act under § 2000e-3(a) – or at least a factfinder could reasonably reach such a conclusion.

Likewise, should a factfinder credit Plaintiff's testimony that he never made the "string her up" comment to Ms. Wallace and that the investigation into this alleged statement was not launched until nearly two months after that incident occurred and just three days after Plaintiff filed his June 6, 2005 EEO complaint, it could find that the investigation and the three-day suspension ultimately imposed upon Plaintiff amounted to materially adverse actions.  See Moore, 461 F.3d at 346 (where response to allegation of employee misconduct "went beyond legitimate discipline and [was] actually motivated by retaliatory animus," jury could conclude that discipline was materially adverse action).

Plaintiff further contends that he was retaliated against in that, after he filed his 2005 EEO complaint, AW Nichols tapped Plaintiff less frequently than other unit managers to serve as acting associate warden when AW Nichols was absent.  (McKinnon

----

National R.R. Passenger Corp., 536 U.S. at 116.  As the Court's discussion, supra, makes plain, Plaintiff failed to demonstrate that Unit Three was such an intolerably discriminatory environment.

Dep. at 104.)  The evidence on this claim is not especially
compelling: Plaintiff served as acting associate warden twice
after filing his EEO complaint, and he alleges that he observed
that Allia Lewis served in the position more than twice as many
times as he did (that is, on more than four occasions).  (Id.)
Nonetheless, the Court agrees with Plaintiff that a factfinder
could conclude that being selected to serve in a position of
authority on a less frequent basis, if the basis for such
selection was retaliatory, see infra, "well might have dissuaded
a reasonable worker from making or supporting a charge of
discrimination," Burlington Northern, 548 U.S. at 68, and
concludes that being denied the opportunity to serve as acting
associate warden is materially adverse.  Cf. Hare v. Potter, 220
Fed. Appx. 120, 129 (3d Cir. 2007) (being denied the opportunity
to participate in a program which could enhance employee skills
is materially adverse).  As to these three aspects of Plaintiff's
retaliation claim, the Court concludes that Plaintiff has adduced
evidence of a materially adverse action.

          ii.   Actions Which Do Not Rise to the Level
               of Material Adversity or for Which There
               is No Admissible Evidence

The Court agrees with Defendants, however, that a
significant number of the disagreeable experiences Plaintiff
complains of do not rise to the level of materially adverse
actions and are not actionable under Title VII, and that

34

Plaintiff lacks admissible evidence regarding other allegedly retaliatory acts.  Foremost among the negative experiences that do not amount to materially adverse actions are Plaintiff's allegations that AW Nichols "intensif[ied] her supervision of Plaintiff . . . [and] micro-manag[ed] his whereabouts," (Compl. ¶ 51(d)), "accosted," (id. at ¶ 51(c)), and "harassed" him about time and attendance matters, (Pl.'s Opp'n Br. at 12), and "questioned Plaintiff's work schedule."  (Compl. ¶ 51(i).)  In recognition of the fact that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience," Moore, 461 F.3d at 346 (quoting Burlington Northern, 548 U.S. at 68)), courts have consistently found that an employee's perception that he has been micro-managed, criticized, or scrutinized by his supervisor fails to rise to the level of "material adversity," Burlington Northern, 548 U.S. at 68 (emphasis in original), and is not actionable as part of a Title VII retaliation claim.  See, e.g., Ahern, 2009 WL 1615402, at *5; Flynn, --- F. Supp. 2d ----, 2009 WL 1204349, at *22 (citing cases).  To the extent that Plaintiff's retaliation claim arises out of such alleged micro-management, criticism, or scrutiny, therefore, see (Compl. ¶¶ 51(c), (d), and (i)), the Court will grant Defendants' motion for

summary judgment.[20]

As to Plaintiff's allegation that "[a]fter the filing of the second EEO Complaint, Plaintiff was not permitted to attend regular staff meetings," (Compl. ¶ 51(q)), the evidence reveals that Plaintiff was not, in fact, excluded from "regular staff meetings," (id.), but instead missed one single meeting in order to meet with AW Maye about his case load.  (McKinnon Dep. at 109-

---

[20]  To the extent that Plaintiff's retaliation claim is premised upon his allegation that AW Nichols made negative comments about Plaintiff to other FCI Fort Dix staff, (Compl. ¶ 51(o)), the Court agrees with Defendants that Plaintiff has not adduced admissible evidence in support of this allegation and that summary judgment must be entered.  In his deposition testimony, Plaintiff stated that several FCI Fort Dix employees told him that AW Nichols had said negative things to them about Plaintiff.  This testimony included Plaintiff's statement that Kisha Hebbon stated to Plaintiff that AW Nichols had told her that Plaintiff should not expect favorable treatment from AW Nichols on account of his having filed an EEO complaint in 2001, (McKinnon Dep. at 29), and Plaintiff's testimony that Kelly Ann Williams and Raja Gilyard stated to him that AW Nichols had made nonspecific negative comments about Plaintiff.  (Id. at 33-34; 38.)

Plaintiff's testimony as to what Hebbon, Williams, and Gilyard stated that they had heard from AW Nichols is clearly being offered "to prove the truth of the matter asserted," (i.e., that these three individuals in fact had the conversations with AW Nichols that they purportedly described to Plaintiff), Fed. R. Evid. 801(c), and is inadmissible hearsay.  While Hebbon, Williams, and Gilyard were employees of FCI Fort Dix, "there is no indication that the statement[s] [were] made concerning a matter within the scope of [Hebbon's, Williams', or Gilyard's] agency or employment with [the BOP]," Blackburn v. United Parcel Service, Inc., 179 F.3d 81, 97 (3d Cir. 1999), making the exception in Rule 801(d)(2)(D), Fed. R. Evid., inapplicable.  Because Plaintiff has produced no admissible evidence that AW Nichols made negative comments about him to other FCI Fort Dix staff, any claim based upon such alleged comments is unsustainable, and summary judgment will be entered.

12.)  Plaintiff has identified no negative consequences that
flowed from having missed this single meeting: there is no
suggestion that having attended the meeting could have
"contribute[d] significantly to the employee's professional
advancement," Burlington Northern, 548 U.S. at 69, and Plaintiff
"has not pointed to any injury or harm [he] suffered" as a result
of missing the meeting.  Nagle v. RMA, The Risk Management Ass'n,
513 F. Supp. 2d 383, 391 (E.D. Pa. 2007).  The Court agrees with
Defendants that missing a single SHU meeting, in the absence of
any additional adverse consequences, would not "dissuade[] a
reasonable worker from making or supporting a charge of
discrimination," and cannot form the basis of a Title VII
retaliation claim.[21]  Burlington Northern, 548 U.S. at 68 (also
explaining that actions are "materially adverse" if they are
"significant," not "trivial").

Finally, the Court agrees with Defendants that Plaintiff has
not adduced evidence to support his allegation that "Ms. Nichols
. . . falsely identified Plaintiff as the proposing official of

---

[21]  To the extent that Plaintiff considers Warden Samuels'
statements that Plaintiff was skating on thin ice and that he was
either with management or against them to have been materially
adverse acts, courts have consistently held that similar
reprimands not to rise to the level of material adversity and are
not actionable as part of a Title VII retaliation claim.  See
Nagle, 513 F. Supp. 2d at 391 (citing cases).  Such statements
may be relevant to the question of whether Warden Samuels was
motivated by retaliatory animus, see Moore, 461 F.3d at 342, but
the statements themselves do not constitute materially adverse
actions.

disciplinary actions against certain other employees at FCI Ft. Dix." (Compl. ¶ 51(r).) Plaintiff's allegation is based upon the fact that at the time he was transferred from Unit Six to Unit Three, a disciplinary matter was pending for an employee in Unit Three, the unit for which Plaintiff was newly responsible. (McKinnon Dep. at 118.) Plaintiff was called upon to sign the letter proposing discipline for the employee pursuant to BOP Program Statement 3000.3, § 750.1, which explains that "Department Heads are the proposing officials for subordinate staff in their departments." (Blaine Cert. Ex. M at 1.) Plaintiff did not think that he should have to sign the letter, since he was not the department head at the time the disciplinary infraction occurred, and he expressed his objection to AW Nichols. (Blaine Cert. Ex. M-1 at 1.) AW Nichols wrote an email to Plaintiff explaining that she "would not force [him] to sign anything if [he] had concerns," and asking Plaintiff to put his concerns in writing "so that they could be reviewed." (<u>Id.</u>) Plaintiff responded:

> I have conveyed my concerns to all concerned. There will be no need for any written response on my behalf. I will report to Denise Northrop this afternoon 11/15/05 to retrieve and sign this proposal letter.

(<u>Id.</u>)

The Court agrees with Defendants that no factfinder could reasonably conclude from this exchange that "Ms. Nichols . . . falsely identified Plaintiff as the proposing official of

38

disciplinary actions against certain other employees at FCI Ft. Dix." (Compl. ¶ 51(r).) Plaintiff may have disagreed with the policy AW Nichols enforced, but AW Nichols did not falsify anything, and Plaintiff himself agreed to sign the letter. Plaintiff's disagreement with AW Nichols' enforcement of the policy, or with the policy itself, does not rise to the level of "material adversity," Burlington Northern, 548 U.S. at 68; Flynn, --- F. Supp. 2d ----, 2009 WL 1204349, at *22, and Defendants' motion for summary judgment as to this aspect of Plaintiff's retaliation claim will be granted.[22]

### iii. Summary

In summary, the Court finds that Plaintiff has adduced sufficient evidence of three materially adverse acts, which, if causally linked to his protected conduct, see infra, are actionable under Title VII: (1) his allegation that he was unfairly investigated and disciplined for the "string her up" statement, (2) his allegedly retaliatory transfer from Unit Six to Unit Three, and (3) the allegedly retaliatory refusal to

---

[22] Plaintiff testified in his deposition that he believed that Unit Four was closed down as a retaliatory act against him, (McKinnon Dep. at 188), although he does not so argue in his Opposition Brief. The record makes clear that Plaintiff began managing Unit Two as soon as Unit Four closed down, and that his responsibilities in Unit Two are no different than they were in Unit Four. (Id. at 194, 197.) Being asked to perform the same duties in a different unit – particularly in the absence of any suggestion that Unit Two was an undesirable unit like Unit Three – is not a materially adverse action.

permit Plaintiff to serve as acting associate warden as often as other unit managers.  As to the remainder of Plaintiff's allegations of retaliation, the Court finds that the allegations lack record support or do not rise to the level of material adversity, and summary judgment will be entered.

### c.   Causal Connection

The final element of Plaintiff's prima facie case for his retaliation claim is the showing of "a causal connection between [Plaintiff's] participation in the protected activity and the adverse employment action."  Moore, 461 F.3d at 340-41.  The Court of Appeals has recognized that a plaintiff can demonstrate causation in the Title VII retaliation context through a variety of means.  First, "[t]here have been cases in which the temporal relation between an adverse employment action and the protected activity has enabled the court to draw the inference of causal relationship," although "temporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not unusually suggestive."[23] Cardenas v. Massey, 269 F.3d 251, 264 (3d Cir. 2001) (internal quotations and citations omitted); see also Clark County School

_____

[23]   A two-day interval between the protected activity and the adverse conduct has been recognized as "unduly suggestive," Cardenas, 269 F.3d at 264 (citation omitted), whereas a three-month interval is not.  See Rogers v. Delaware, Dept. of Public Safety/DMV, 541 F. Supp. 2d 623, 627 (D. Del. 2008) (citing cases).

Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) ("The cases that
accept mere temporal proximity between an employer's knowledge of
protected activity and an adverse employment action as sufficient
evidence of causality to establish a prima facie case uniformly
hold that the temporal proximity must be very close").

Alternatively, where the timing itself is not unduly
suggestive, a plaintiff can satisfy the causation element by
producing evidence of "antagonism or retaliatory animus toward
plaintiff." Rogers v. Delaware, Dept. of Public Safety/DMV, 541
F. Supp. 2d 623, 627 (D. Del. 2008) (citing Farrell v. Planters
Lifesavers Co., 206 F.3d 271, 279-81 (3d Cir. 2000)). Finally,
the Court of Appeals has also recognized that the "evidence,
looked at as a whole, may suffice to raise the inference," where,
for example, "the employer gave inconsistent reasons for [the
adverse action]." Farrell, 206 F.3d at 280-81.

i.  Investigation/Discipline

Applying this authority to Plaintiff's claim, the Court
concludes that Plaintiff has satisfied his burden of
establishing, at the prima facie case stage, a causal connection
between the filing of his 2005 EEO complaint and both the
investigation/discipline of his April 2005 telephone call and his
transfer from Unit Six to Unit Three. As to the allegedly
retaliatory investigation, the Court concludes that the timing of
this event is so closely tied to the filing of Plaintiff's EEO

complaint that the temporal relationship alone is sufficient to establish the requisite causal connection. See Cardenas, 269 F.3d at 264; Farrell, 206 F.3d at 280-81. While Defendants assert that the investigation was launched in the immediate wake of Plaintiff's April 11, 2005 telephone call, no evidence of record supports this contention, see Note 9, supra; the earliest evidence of the investigation is from June 9, 2005 – three days after Plaintiff contacted the EEO counselor – when the SIS Investigator interviewed the witnesses to the April 11, 2005 telephone call. The three-day interval between the filing of Plaintiff's EEO complaint and the apparent commencement of the investigation into Plaintiff's three-month-old telephone conversation is itself sufficient to demonstrate a causal connection at the prima facie case stage. See Cardenas, 269 F.3d at 264; Farrell, 206 F.3d at 280-81.

### ii.  Unit Transfer

Although it presents a closer question, the Court likewise finds that a factfinder could trace a causal link between Plaintiff's EEO activity and the transfer of Plaintiff from Unit Six to Unit Three. The timing between these events – Plaintiff filed his EEO complaint in June 2005 and was transferred two months later in August 2005 – likely would not, without more, give rise to an inference of causation. Compare Farrell, 206 F.3d at 280 (finding one-month interval to be a "relatively short

42

period," but leaving unanswered whether it is "unusually suggestive" as a matter of law), with Rogers, 541 F. Supp. 2d at 627 (three-month interval not unusually suggestive).

However, viewing the evidence in the light most favorable to Plaintiff and drawing all inferences in his favor, the Court finds that a factfinder could conclude that Warden Nash, the ultimate decisionmaker responsible for the August 22, 2005 transfer,[24] had warned Plaintiff not to file an EEO complaint, and had thereby exhibited animus toward Plaintiff's prior and proposed future Title VII-protected conduct. See Marra v. Philadelphia Housing Authority, 497 F.3d 286, 308-09 (3d Cir. 2007) (a jury could rely upon an employer's warning not to participate in Title VII-protected activity in making a finding of retaliatory animus). Warden Nash's admonition that Plaintiff not do anything he would regret, (McKinnon Dep. at 55), in response to Plaintiff's complaint that he was being harassed and discriminated against, does not necessarily present the strongest example of retaliatory animus, and the jury could disbelieve Plaintiff's testimony concerning Warden Nash's statement, (Nash Dep. at 37), or find that the statement did not exhibit retaliatory animus. Nonetheless, drawing inferences in Plaintiff's favor and recognizing that courts interpret "the

---

[24]   Warden Nash was ultimately responsible for the decision regarding the unit reassignments, although he testified that he relied heavily upon AW Nichols' input.  (Nash Dep. at 59-60.)

causal link requirement broadly," <u>Davis v. Coca-Cola Bottling Co.</u> <u>Consol.</u>, 516 F.3d 955, 978 n.52 (11th Cir. 2008), the Court concludes that a factfinder could draw a causal connection between Plaintiff's EEO filing and his undesirable unit transfer.

### iii. <u>Acting Associate Warden Assignments</u>

By contrast, Plaintiff has adduced no evidence to suggest that there is a causal connection between his Title VII-protected conduct and AW Nichols' failure to assign Plaintiff to serve as acting associate warden as often as other unit managers.  First, Plaintiff cannot rely on the temporal proximity between his EEO filing and any action on AW Nichols' part.  Plaintiff has not identified a specific date on which he believes he should have been called upon to serve as acting associate warden.  Rather, he refers generally to the months-long span following his EEO filing, during which time he believes he was, on the whole, tapped for the acting associate warden position too infrequently. <u>See</u> <u>Cardenas</u>, 269 F.3d at 264.  Because Plaintiff has not shown a "temporal relation between an adverse employment action and the protected activity" that is "unduly suggestive" with regard to the acting associate warden assignments, he cannot rely on timing alone to draw the causal connection.  <u>Id.</u> (internal quotations and citations omitted).

Nor does the Court find that Plaintiff has adduced evidence

44

that AW Nichols exhibited retaliatory animus toward Plaintiff.[25]
While the relationship between Plaintiff and AW Nichols was
clearly strained, it is well-established that a "difficult work
relationship" alone does not demonstrate retaliatory animus on
the part of a supervisor.  Hixson v. County of Alameda Sheriff's
Dept., No. 97-0589, 1999 WL 305513, at *9 (N.D. Cal. May 12,
1999); see also, e.g., Swanson v. General Services Admin., 110
F.3d 1180, 1185-86 (5th Cir. 1997).  Nor can Plaintiff satisfy
his burden of proving retaliatory animus merely by producing
evidence that AW Nichols micromanaged or closely supervised
Plaintiff.[26]  See, e.g., Griffin v. Potter, 356 F.3d 824, 829-30
(7th Cir. 2004); Lillie v. Chartwells, No. 04-5453, 2007 WL
951900, at *8 (N.D. Ill. Mar. 26, 2007) ("Courts have held that a
supervisor can criticize and micromanage a subordinate and it
will not be actionable absent evidence of discriminatory [or

---

[25]  In assessing whether an adverse employment decision was
impacted by animus, the Court focuses upon the decisionmaker and
those who have been shown to have influenced the decision.
See Abramson v. William Paterson College of New Jersey, 260 F.3d
265, 285 (3d Cir. 2001).  AW Nichols alone made decisions
regarding who would act as associate warden in her absence.
(Nichols Dep. at 92-94.)

[26]  As the Court explained in Note 17, supra, to the extent
that Plaintiff believes that AW Nichols "retaliated" against him
because he was the supervisor responsible for proposing that
Daisy Rodriguez be terminated, his actions in disciplining Ms.
Rodriguez did not constitute "participat[ing] in any manner in an
investigation, proceeding, or hearing under Title VII," Robinson,
982 F.2d at 896 n.4 (brackets and citation omitted), and cannot
form the basis of a retaliation claim.

retaliatory] animus") (citing cases).  Whereas a jury could
conclude that Warden Nash admonished Plaintiff not to engage in
Title VII-protected activity, a close review of the record
reveals no such evidence of retaliatory animus on the part of AW
Nichols.[27]  The "evidence, looked at as a whole," demonstrates a
strained interpersonal relationship, but Plaintiff has not
adduced evidence of retaliatory animus on AW Nichols' part.
Farrell, 206 F.3d at 280-81.  To the extent that Plaintiff's
retaliation claim is based upon his claim that AW Nichols
retaliated against Plaintiff by failing to call upon him to act
as associate warden in her absence, the Court will grant
Defendants' motion for summary judgment.

     In summary, the Court finds that Plaintiff has made out a
prima facie claim for retaliation as to two of the adverse
actions alleged in his Complaint: (1) his allegation that he was
unfairly investigated and disciplined for the "string her up"
statement, and (2) his allegedly retaliatory transfer from Unit
Six to Unit Three.  Summary judgment will be entered as to the
remainder of the allegations underlying Plaintiff's retaliation
claim.

------

     [27]  Plaintiff's testimony concerning statements other FCI
Fort Dix staff made to him is inadmissible hearsay, see Note 20,
supra, and cannot be considered upon summary judgment.
See Blackburn v. United Parcel Serv., 179 F.3d 81, 95 (3d Cir.
1999) ("[A] hearsay statement that is not capable of being
admissible at trial should not be considered on a summary
judgment motion.").

2.   <u>Defendants' Explanation and Pretext</u>

As to the allegedly retaliatory investigation of Plaintiff and unit transfer, under <u>McDonnell Douglas</u>, the burden shifts to Defendants to articulate a non-retaliatory explanation for its employment decisions, and, upon Defendants' articulation of such an explanation, the burden shifts back to Plaintiff to discredit the proffered reasons.   <u>See</u> <u>Waldron</u>, 56 F.3d at 494.

a.   <u>Investigation/Discipline</u>

With regard to the initiation of the SIS investigation into Plaintiff's April 11, 2005 telephone call, Defendants reiterate their position that the investigation was launched in the immediate wake of the call itself, and not upon Plaintiff's June 6, 2005 filing of his EEO complaint.   For similar reasons to those discussed above, the Court finds, based upon the evidence adduced by Plaintiff, that a reasonable factfinder could discredit Defendants' explanation for the initiation of the investigation.   <u>See</u>, <u>e.g.</u>, <u>Canady v. Wal-Mart Stores, Inc.</u>, 440 F.3d 1031, 1037 (8th Cir. 2006) (a plaintiff "may rely on the same evidence to prove both pretext and discrimination") (internal quotations and citations omitted); <u>Khair v. Campbell Soup Co.</u>, 893 F. Supp. 316, 333 n.17 (D.N.J. 1995) (same). Whereas Defendants have pointed to no evidence to support their contention that the investigation commenced shortly after the April 11, 2005 telephone call, <u>see</u> Note 9, <u>supra</u>, Plaintiff notes

correctly that the earliest evidence in the record of any
investigation into the telephone call is from June 9, 2005, which
is the date when SIA Pittman interviewed witnesses to the call.
(Blaine Cert. Ex. G-5 at 3.)  Relying upon this evidence, and in
light of Defendants' failure to adduce evidence to the contrary,
a jury could reasonably disbelieve Defendants' contention that
the investigation was launched in April 2005, and conclude
instead that the investigation did not commence until after
Plaintiff filed his June 6, 2005 EEO complaint.  See Sempier v.
Johnson & Higgins, 45 F.3d 724, 731 (3d Cir. 1995) ("The
factfinder's disbelief of the reasons put forward by the
[employer] . . . may, together with the elements of the
[employee's] prima facie case, suffice to show intentional
discrimination") (quoting Saint Mary's Honor Center v. Hicks, 509
U.S. 502, 511 (1993)).

The Court accordingly concludes that a material factual
dispute exists as to the timing of the SIS investigation and
whether the investigation was commenced for retaliatory purposes.
Summary judgment as to this aspect of Plaintiff's retaliation
claim will thus be denied.

b.   Unit Transfer

With regard to the transfer of Plaintiff from Unit Six to
Unit Three, Defendant adduces evidence in favor of its non-
retaliatory explanation.  According to AW Nichols' deposition

testimony, Plaintiff was transferred to Unit Three because no other unit was an option: Plaintiff was already managing Unit Six and could not stay, Plaintiff's wife worked in Unit One and was being transferred to Unit Five, Plaintiff had "expressed concern about going to Unit 4," and Unit Two, as the most stable unit, was reserved for a new, inexperienced unit manager.  (Nichols Dep. at 65.)

The difficulty with this explanation is that it is, in part, contradicted by Plaintiff's deposition testimony that he never expressed concerns to AW Nichols about working in Unit Four.  (McKinnon Dep. at 164.)  Indeed, as compared to Unit Three, which "nobody wanted to go to," (McKinnon Dep. at 161), McKinnon testified that Unit Four was an especially desirable placement because "you had the most senior staff there who knew exactly what they was doing" and the unit manager could "just cruise right on through."  (Id. at 171.)  Plaintiff testified that he had expressed "no concern" about being transferred to Unit Four.  (Id. at 164.)

Defendants' non-retaliatory explanation and Plaintiff's evidence thus present factual dispute that the Court cannot resolve upon summary judgment.  Should the jury credit Plaintiff's, rather than AW Nichols', testimony on the issue of whether Plaintiff had requested not to be transferred to Unit Four, then it could find that Defendants' explanation for the

transfer – that no other unit was an option – "did not actually motivate the employment action." Fuentes, 32 F.3d at 764 (internal quotations and citations omitted).  This, "together with the elements of [Plaintiff's] prima facie case, [can] suffice to show intentional discrimination," Sempier, 45 F.3d at 731 (citation omitted), making summary judgment inappropriate. Finding that a material question of fact exists as to whether Plaintiff was transferred to an undesirable in retaliation for having engaged in Title VII-protected activity, the Court will deny Defendants' motion for summary judgment as to this aspect of Plaintiff's retaliation claim.

### D.  Disparate Treatment Claim

Finally, the Court addresses Plaintiff's disparate treatment claim, in which Plaintiff alleges that he was treated less favorably than Allia Lewis, a female unit manager, on account of his sex.  Under Title VII, claims for disparate treatment are analyzed under the same burden-shifting framework discussed above.  See Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 281 (3d Cir. 2001).  To establish a prima facie case of gender discrimination, a plaintiff must demonstrate (1) membership in a protected class, (2) an adverse employment action by the defendant, and (3) that a similarly situated employee not in the plaintiff's protected class was treated more favorably. See, e.g., Scheidemantle v. Slippery Rock University State System

of Higher Education, 470 F.3d 535, 539 (3d Cir. 2006); see also

Abramson, 260 F.3d at 281-82.

As the Court noted, supra, there is a critical distinction

between the "materially adverse action" element of a retaliation

claim and the "adverse employment action" element of a disparate

treatment claim.   See, e.g., Hill v. Kempthorne, 577 F. Supp. 2d

58, 66 (D.D.C. 2008).

> [I]n the retaliation context, an employment action that
> is "materially adverse" is considered more broadly as one
> that is "likely" to "dissuade[] a reasonable worker from
> making or supporting a charge of discrimination."
> Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S.
> 53, 68 (2006); Ginger v. Dist. of Columbia, 527 F.3d
> 1340, 1346 (D.C. Cir. 2008).  The threshold is lower than
> the standard for "adverse" action for discrimination
> claims (which requires a tangible impact on the terms,
> conditions or privileges of employment) because the
> statute is intended to provide broad protection to
> encourage disclosure of discrimination.  White, 548 U.S.
> at 63-67.

Johnson v. District of Columbia, 572 F. Supp. 2d 94, 110-11

(D.D.C. 2008); see also Flynn, --- F. Supp. 2d ----, 2009 WL

1204349, at *19 ("the standard that the plaintiff must meet is

lower for a retaliation claim than for a disparate treatment

claim").

As to the more demanding "adverse employment action" element

of a disparate treatment claim, the Court of Appeals has

explained that the term means "an action by an employer that is

serious and tangible enough to alter an employee's compensation,

terms, conditions, or privileges of employment."[28]  Storey v.
Burns Intern. Security Services, 390 F.3d 760, 764 (3d Cir. 2004)
(citation omitted).

> An adverse employment action must be one that produces a
> material employment disadvantage.  Termination, cuts in
> pay or benefits, and changes that affect an employee's
> future career prospects are significant enough to meet
> the standard, as would circumstances amounting to a
> constructive discharge.  Minor changes in duties or
> working conditions, even unpalatable or unwelcome ones,
> which cause no materially significant disadvantage do not
> satisfy the prong.

Higgins v. Gonzales, 481 F.3d 578, 584 (8th Cir. 2007) (internal
quotations and citations omitted, emphasis added); see also
Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008) (same);
cf. Scott v. New Jersey, 143 Fed. Appx. 443, 446 (3d Cir. 2005)
("a purely lateral transfer, that is, a transfer that does not
involve a demotion in form or substance, cannot rise to the level
of a[n] . . . adverse employment action") (citation omitted).

Applying this authority to the facts presented here, the
Court concludes that while some of the conduct at issue herein

---

[28]  The Court of Appeals further explained:

That definition stems from the language of Title VII
itself. The statute provides: "It shall be an unlawful
employment practice for an employer . . . to fail or
refuse to hire or to discharge any individual, or
otherwise to discriminate against any individual with
respect to his compensation, terms, conditions, or
privileges of employment, because of such individual's
race, color, religion, sex, or national origin." 42
U.S.C. § 2000e-2(a)(1) (emphasis added).

Storey, 390 F.3d at 764.

meets the lower "material adversity" threshold for his
retaliation claim, Plaintiff has failed to adduce evidence
sufficient to suggest that he suffered an adverse employment
action for purposes of his disparate treatment claim.  First,
while being transferred to the most challenging unit could
conceivably "dissuade[] a reasonable worker from making or
supporting a charge of discrimination," Burlington Northern, 548
U.S. at 68, Plaintiff's evidence fails to support his contention
that the transfer was an adverse employment action for purposes
of his disparate treatment claim.  There is no suggestion from
the evidence that Plaintiff's transfer to Unit Three resulted in
a "cut[] in pay or benefits," or was the sort of "change[] that
affect[s] an employee's future career prospects." Higgins, 481
F.3d at 584.  Plaintiff had identical job duties (albeit amongst
colleagues whom he found to be disagreeable), for which he
received identical compensation.  This was a "purely lateral
transfer," not "a demotion in form or substance" (such as when a
police officer is transferred from a position in the field to a
desk job), and, as such, it did not amount to an adverse
employment action.  Scott, 143 Fed. Appx. at 446; Mathirampuzha,
548 F.3d at 78.

       Plaintiff further complains that AW Nichols accorded Ms.
Lewis favorable treatment by advising her of "staff movements and
unit projects of which Plaintiff was not advised."  (Compl. ¶

56.)  Plaintiff's deposition testimony makes plain that this
allegation is rooted in two instances of Plaintiff learning of
information pertaining to administrative matters at the
institution later than Ms. Lewis, which he concedes did not
impact his ability to do his job.  (McKinnon Dep. at 85.)  There
is absolutely no suggestion from the evidence that the timing AW
Nichols' disclosure of this information to Plaintiff negatively
impacted his "future career prospects," Higgins, 481 F.3d at 584,
or otherwise impacted his compensation or the terms or conditions
of his employment.  Storey, 390 F.3d at 764.  The timing of AW
Nichols' disclosure did not amount to an adverse employment
action.

     Of Plaintiff's remaining allegations in support of his
disparate treatment claim, the Court agrees with Defendants that
the allegations are either undermined or otherwise unsupported by
the record.[29]  While Plaintiff complains that Ms. Lewis
"receive[d] higher performance evaluations" than Plaintiff,
(Compl. ¶ 59), the evidence in the record in fact reveals that
Plaintiff's evaluations were (slightly) better than those of Ms.
Lewis.  (Blaine Cert. Ex. Q at 1-22.)  While Plaintiff refers in

---

[29]  To the extent that Plaintiff's disparate treatment claim
is based upon his allegation that he was denied secretarial and
administrative staff, the Court explained in Note 18, supra, that
this claim falls "outside the statutory time period" and is not
actionable herein.  National R.R. Passenger Corp., 536 U.S. at
105.

his brief to unspecified professional benefits associated with serving in the acting associate warden position, he has adduced no <u>evidence</u> to suggest that serving in the acting associate warden position one or two times less than Ms. Lewis did impacted his pay, benefits, or career prospects.  <u>See</u> <u>Higgins</u>, 481 F.3d at 584.  And while Plaintiff complains that Ms. Lewis was "sent to event forums that Plaintiff has not been permitted to attend," Plaintiff has pointed to no evidence that supports this allegation; in his Statement of Undisputed Material Facts, Plaintiff merely references the allegation in his Complaint, which is insufficient to defeat a motion for summary judgment.  <u>See</u> <u>Marten v. Godwin</u>, 499 F.3d 290, 295 (3d Cir. 2007).

In summary, the Court finds that Plaintiff has failed to make out a prima facie case for disparate treatment.  Defendants' motion for summary judgment as to Plaintiff's disparate treatment claim will accordingly be granted.

## IV.   CONCLUSION

For the reasons set forth above, the Court will deny Defendants' motion for summary judgment as to Plaintiff's retaliation claim, to the extent that the claim is premised upon (1) Defendants' allegedly retaliatory investigation and discipline of Plaintiff for the April 11, 2005 telephone call, and (2) the allegedly retaliatory transfer of Plaintiff to Unit Three.  The remainder of Defendants' motion for summary judgment,

including the motion for summary judgment as to Plaintiff's

hostile work environment and disparate treatment claims, will be

granted.   The accompanying Order is entered.


**July 24, 2009**                              **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         United States District Judge

56